**DOROTHY FUE WONG**
**601 NORTH GRAND AVE. #460**
**LOS ANGELES, CA 90012**
**TEL: (213-537-0777)**

Plaintiff Dorothy Fue Wong, IN PRO PER

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County Of Los Angeles

APR 29 2014

Sherri R. Carter, Executive Officer/Clerk
By: Amber Hayes, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

DOROTHY FUE WONG,

                    Plaintiff,

vs.

VILLAGE GREEN OWNERS'
ASSOCIATION; Robert Nicolais, an
individual; Steven Keylon, an individual; Steve
Haggerty, an individual; and Does 1 through
500

                    Defendant.

Case No
            AMENDED BC531391

COMPLAINT FOR
  1. Copyright Infringement

  2. Fraudulent Claim to National
  Register and National Landmark
  Nominations

  3. Appropriation and Nonpayment
  of the National Landmark Nomination
  (tort)

  4. Fraud Relating to Mills Act and
  Other Preservation Activities

  5. Declaratory Relief

Plaintiff alleges:

### PARTIES

    1. Plaintiff DOROTHY FUE WONG is an individual residing in the City and

County of Los Angeles, California.

    2. Defendant VILLAGE GREEN OWNERS' ASSOCIATON is a California

1

nonprofit corporation doing business in the City and County of Los Angeles, California.

3. All of the Defendant's conduct giving rise to the within causes of action took place
within the City and County of Los Angeles.

4. Defendant Robert Nicolais is an individual residing at Village Green is the designated National Landmark and preservation expert for the Board of Directors of Village Green Association. He is responsible for certain conduct resulting in damages to Plaintiff as hereinafter alleged.

5. Defendant Steven Keylon is an individual residing at Village Green is the designated National Landmark historian and preservation expert for the Board of Directors of Village Green Association. He is responsible for certain conducts resulting in damages to Plaintiff as hereinafter alleged.

6. Defendant Steve Haggerty has been prominent in the leadership of the Village Green Board of Directors as president and treasurer. He is an owner of a rental unit at the Village Green. He is responsible for certain conducts resulting in damages to Plaintiff as hereinafter alleged.

7. Plaintiff is ignorant of the true names and capacities of the Defendants named herein as DOES 1 through 500 and therefore name them by said fictitious names. Plaintiff will amend this complaint to show their real names when they have been ascertained. Plaintiff is informed and believes and therefore alleges that said Defendants are responsible in some manner for the events, happenings and damages herein alleged.

2

*COMPLAINT FOR DAMAGES*

**EXHIBIT B**
**6**

## INTRODUCTION

8. The Village Green is a 64-acre planned community located in northwest central Los Angeles. It is organized as a homeowners association with approximately 500 members, and a Board of Directors who has responsibility for a budget of over 3 million dollars. Built in 1942, this site (historically known as Baldwin Hills Village) has earned international recognition for its innovative community design of open spaces and affordable housing.

9. The Plaintiff prepared the National Register nomination (1992) and the National Historic Landmark nomination (2001) during the three decades that she lived at the Village Green. Her work on "The Baldwin Hills Village National Historic Landmark Nomination" listed this community as one of the most significant sites in the more than 14,000-year history of the American continent, which is now the United States. The federal government has given recognition to only 2,600 of these sites, which represent a permanent legacy for future generations.

10. Within a decade, the Baldwin Hills Village National Historic Landmark nomination gained further prominence. The federal government placed it on its National Historic Landmark website for over a decade as one of the ten top "recent and selected National Historic Landmark nominations". In 2005, the federal government used this nomination to help list two related Garden Cities as National Historic Landmarks (Radburn and Chatham Village). During this same period, the Baldwin Hills Village National Historic Landmark nomination also was used to help two related Garden Cities in Los Angeles city to be saved from demolition.

11. In addition, the Plaintiff's nomination contributed significantly to the economic health of the Village Green after its National Landmark designation in January 2001. For National Landmarks can receive potentially millions of dollars

3

**EXHIBIT B**
7

that include first priority in funding, free technical assistance from the federal government, and special disaster relief.   The Plaintiff's study has demonstrated the dramatic impact of this rare certification on the Village Green's increased real estate prices from 1994 to 2010. A financial professional estimated that during this period the homeowners gained 23 million dollars because of the National Landmark certification.  The Board of Directors in 2005 established a nonprofit organization to take advantage of the economic benefits for National Landmarks.

12. Financing the preparation of the Village Green's National Landmark nomination was extraordinary high.  In 1992 and 1996, the federal government evaluated the cost of this nomination. It came to the conclusion that this project was too expensive for it to undertake. First, it required establishing a new National Landmark category for the history of planned communities in the United States. An expert would need to be hired in undertaking this massive work. Second, the Village Green is unusually large and complex for a National Landmark with its 64-acres and 96 buildings. At present, the Village Green is the largest of the twenty National Landmarks in Los Angeles County and one of the largest in the state of California.

13.  Circumstances placed the Plaintiff in a position where she was forced to assume the costs for the fulltime preparation of the Village Green's National Landmark nomination. She was single, a senior citizen, and her only income was a limited teachers retirement.  By 2000 when the nomination was completed, the Plaintiff used her life savings of approximately $146,423.37 to complete this work.  At that time, she was 62 years old.

14. In 1997, the Board of Directors  (the Defendants) in their fiduciary position had an opportunity to undertake the costs for preparing the National Landmark nomination. The Plaintiff presented them a contract after conducting a lengthy

4

feasibility study. However, the Board eliminated the National Landmark project in a closed meeting and against the wishes of the community. No reason was given.

15. The Plaintiff then decided to continue working independently on the National Landmark nomination because she knew it would be morally wrong to not do so. The Plaintiff was the only one who knew the Village Green's history. The last founding architect Robert Alexander handed this legacy to her before he died in 1992. Also, the Plaintiff had the required research and writing skills as she has four graduate degrees---- M.A. from Columbia Teachers College, Advanced M.A. and PhD from the University of Southern California, and MLS from the University of California, Los Angeles. Finally, the Plaintiff  knew that the community's future survival would eventually depend on the benefits provided by the National Landmark certification.

16. In 1999, the Board of Directors reinstated the National Landmark project because of community pressure.  In Fall 2000, the Board of Directors and the homeowners (the Defendants) gave unanimous written consent to the federal government for listing the Village Green as a National Landmark.

17.  After National Landmark certification in January 3, 2001, the Board of Directors (Defendant) within a month fought against paying the Plaintiff for her work on the National Landmark nomination.  For more than a decade, it stated that she was a volunteer and volunteers are not paid.  These individuals knew the Plaintiff's preparation cost for the National Landmark nomination and that she financed it using her retirement fund.

18. At the same time, the Board of Directors discontinued the Plaintiff's 2000 preservation program that supported professional standards required for the Village Green to remain a National Landmark.  For this certification can be removed if professional standards are not maintained for the nationally significant

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**9**

buildings and landscape. The Board of Directors replaced leading professionals with volunteer homeowners who had no experience with preservation or National Landmarks. The released professionals were also critical in facilitating outside funding.

19. In 2001, the Plaintiff made a second major moral decision in regards to this National Landmark project. The Plaintiff decided to resolve the preparation costs of the National Landmark nomination because her constitutional rights to due process (Fifth and Fourteenth Amendments) and the freedom of expression (First Amendment) were violated. In order to finance these endeavors, the Plaintiff took the equity from her home as she had no savings left.

20. During a decade, the Plaintiff presented increased evidence to the Defendants that it was common practice for paid professionals to prepare National Landmark nominations and that institutions fund this type of work rather than individuals (EXHIBIT G and EXHIBIT H). However, the Defendants continued to support non-payment of this nomination while enjoying its benefits.

21. In terms of preservation, the Plaintiff established the website LandmarkWatch.org in 2005 where she placed her research on preservation and funding for National Landmarks. In addition, she received two Cornell University's fellowships in the preservation of the Village Green and related National Landmark planned communities on the east coast (2008 to 2012). The first fellowship was establishing preservation standards for these historic communities based on common practices of leading National Landmarks in Los Angeles County. The second was on disaster planning for these historic communities as the federal government provides special disaster recovery for National Landmarks.

6

22. However, the Plaintiff's efforts did not make an impact on the Defendants. Within a decade, the community lost millions of dollars in outside funding because public policies and common practices for National Landmarks were not followed.   Also,  the homeowners in 2010 faced a 5 million dollar assessment for deferred maintenance that could have been avoided if preservation standards were followed.

23. In mid-2009, the Plaintiff was not able to pay her mortgage loans because of the Board of Directors' decade-long resistance to nonpayment for the National Landmark nomination costs while enjoying its benefits. On April 6, 2011, the Plaintiff lost her Village Green home through foreclosure where she lived for three decades. In that same year, she declared bankruptcy.  The Plaintiff now lives in subsidized senior housing.

24. In October 29, 2012, the Internal Revenue declared that the Plaintiff was "a hardship case", and continued this same evaluation in January 2014.  At present, she has no financial assets, and her only income is her limited monthly teachers retirement.  At 75 years old, the Plaintiff has very limited employment opportunities. Consequently, she has taken personal loans to resolve through the courts the constitutional issues involving the complex intellectual property that she produced.

25. The Plaintiff believes that her constitutional rights to due process and those guaranteed by the First Amendment are of paramount importance to her as an individual. They were more important than the loss of her life savings and home, along with a community that she worked diligently to protect and preserve during a lengthy period.

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**11**

## FIRST CAUSE OF ACTION

### (Copyright Infringement)

26. The foundation for this discussion is the U.S. Constitution's Article 1, Section 8: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and inventors the exclusive Rights to their respective Writings and Discoveries". This section is particularly relevant to our current society as intellectual properties represent a much greater valuation than real properties. This is because of the transformational advances in computer technologies during the last few decades.

27. The U.S. Copyright Office has granted the copyright to the Plaintiff for "The Baldwin Hills Village National Historic Landmark Nomination", which included text and 22 of the Plaintiff's photographs (TXu 1-768-642) on April 25, 2011 (EXHIBIT A-1). After careful study, a representative from the U.S. Copyright Office concluded that the Plaintiff substantially contributed to this National Landmark nomination because of her in-depth research and writing (6 years) along with her heavy investment of time and cost. The description by Defendant Robert Nicolais added to this work at minimal expense.

28. This representative from the U.S. Copyright Office also stated that the scope of the Plaintiff's copyright does not include contributions from others. Any additional contributors would need to apply for a separate copyright in registering their particular works. As of this date, the Plaintiff is recognized as the sole owner of the Baldwin Hills Village National Historic Landmark Nomination.

29. Previously, the U.S. Copyright Office has granted two other copyrights for the same content of this work on November 17, 1999 (TXu00922795) and June 15, 2004 (TXu001203415). These have been incorporated into the recent copyright of "The Baldwin Hills Village National Historic Landmark Nomination".

8

30. Since 2005, the Plaintiff has made it available to researchers and others on her website LandmarkWatch.org. She has placed a copyright symbol next to this digital version, which indicated that this work is protected by the copyright law. Thus, the Defendants had full knowledge for several years that this work was copyrighted.

31. On October 23, 2013, the Plaintiff discovered that the Defendants uploaded her registered intellectual property "The Baldwin Hills Village National Historic Landmark Nomination" with her 22 photographs on their website (VillageGreenLA.net) without her permission (EXHIBIT B-1). As a consequence, they have committed copyright infringement in displaying this work without permission from the Plaintiff, who is the registered owner. Archive.org has indicated that the Plaintiff's nomination with her photographs were on the Defendants' website on May 12, 2013 but not on in 2012 or 2011 (EXHIBIT P ). Thus, this copyright infringement is within the statute of limitation.

32. The Defendants may state that the above action is fair use of the Plaintiff's registered intellectual property "The Baldwin Hills Village National Historic Landmark Nomination" because of the Village Green's status as a nonprofit organization (mutual benefit corporation) rather than a commercial enterprise. However, the Defendants will need to prove the following criteria for fair use established by the U.S. Copyright Office (section 107 of the Copyright Law—Title 17, U.S. Code):

"1. The purpose and character of the use, including whether such use is of commercial nature or is for nonprofit educational purposes".

"2. The nature of the copyrighted work."

"3. The amount and substantiality of the portion used in relation to the copyrighted work as a whole. 4. The effect of the use upon the potential market for, or value of,

9

the copyrighted work".

33. To facilitate this discussion, the complaint will use the following "Fair Use Checklist" developed by the Copyright Advisory Office of he Columbia University Libraries (EXHIBIT B-2 to 3) for three of the above criteria.

34. A. Purpose---The Columbia University checklist considered "commercial activity", "profiting from the use", and "bad-faith behavior" to be opposing fair use. Substantial evidence has demonstrated that the Defendants during the last decade have made substantial economic gains using the Plaintiff's registered intellectual property. The Defendants have repeatedly refused to pay the Plaintiff for this intellectual property.  She used her assets to fund this intellectual property based on the Defendants' prior consent.  For a decade the Defendants had substantial evidence that it is common practice for preparers of National Historic Landmark nominations to be paid because of the highly technical work that is required (EXHIBIT I-1 to 3) and the potential benefits to be received (EXHIBIT F-1 to 3).

35. During this decade, the Defendants have used the product of the Plaintiff's work (the certification "Village Green National Landmark") to establish a nonprofit organization to gain first priority in various outside funding. In 2010, the Defendants have used the Plaintiff's work (the content and the certification) to gain 6 million dollars in a decade from the City of Los Angeles's Mills Act (property tax reduction program for owners of historic properties).

36. B. Amount---The Columbia University checklist stated that "Large portions or whole work used" is opposing fair use. The defendants uploaded the entirety of the Plaintiff's registered "Baldwin Hills Village National Historic Landmark Nomination".

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**14**

37. C. _Effect_---The Columbia University checklist stated that "You made it accessible on the Web or in other public forum" and "repeated or long-term use" are factors opposing fair use. The Defendants have placed the Plaintiff's registered "Baldwin Hills Village National Historic Landmark Nomination" publicly on their website.  Thus, the Defendants and the Village Green community have been and continue to use this work repeatedly.

38. The Defendants have used this registered intellectual property for the long term.  First, it is the most authoritative work on the history of the Village Green.  For it was completed by the Plaintiff under the guidance of Cornell University and the federal government.  Second, the Defendants have repeatedly used this registered intellectual property as a foundation for their preservation activities, such as the development of the Historic Structures Report (2010) and the Cultural Landmark Report (2013).  The Plaintiff's substantial contributions have been reported in theses two official documents, which are fundamental to the long-term preservation of the Village Green.

39. The Village Green Homeowners (with its Board of Directors as its representation) is a government entity and a "creature of the state". Thus, it is mandated to follow these provisions of the U.S. Constitution: Article I, section 8 (copyright protection) with Fifth and Fourteenth amendments for due process.

40. The Plaintiff requests the following restitution. The Defendants are to pay full restitution as defined in the U.S. Copyright Law for Copyright Infringement. Attorney fees are to be paid to the attorney whom the Plaintiff consulted about these legal matters.

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**15**

## SECOND CAUSE OF ACTION

(Fraudulent Claims to National Register and National Landmark Nominations)

41. The definition of fraud is defined by Civil Code §3294, subd. (e)(3): "As used in the statute, "fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

42. The subject of this Cause of Action is Defendant Robert Nicolais, an architect and the Board of Directors' official representative to the National Historic Landmark program since 2002. He also served on the Board of Directors for five years---2006 and 2007; 2009 to 2011. Defendant Nicolais also prepared the description for the Baldwin Hills Village National Historic Landmark nomination (2000). He was instrumental in obtaining a Getty grant for the LeBrun Mural project in 2000 and then a matching grant in 2002 (which was later returned).

43. Defendant Robert Nicolais has made fraudulent claims to the community in his involvement of the National Historic Landmark nomination for the Historic Structure Report (made available to the public in 2011) and then fraudulent claims to involvement of the National Register and National Landmark nominations in the Cultural Landscape Report that was published on May 13, 2013 and December 2013.

44. These fraudulent claims in these documents is a continuation of his actions against the Plaintiff that began over a decade ago in order to promote his authority on the National Historic Landmark program by diminishing the Plaintiff's contribution (EXHIBIT H-1). The Third Cause of Action describes how Defendant Niciolais' fraudulent claims as an expert in the National Historic nomination with the leadership contributed to the severe injuries suffered by the Plaintiff. It resulted

12

in her losing her home and leaving the Village Green community permanently.

45. The Cultural Landscape Report (2013) states: "Dorothy Fue Wong, a long-time resident, took the first step toward national recognition of the Village Green by preparing a National Register of Historic Place nomination in 1993 and a National Historic Landmark nomination in 2000. Robert Nicolais assisted with both efforts providing architectural descriptions and research" (EXHIBIT D-1).

46. As reported in the Cultural Landscape Report, Defendant Nicolais made fraudulent claim to authorship for the National Register nomination. Wesley Robbins is the author of the description for the National Register nomination. Robbin's written description provided an invaluable framework for Defendant Nicolais' later description for the National Historic Landmark nomination. Thus, Defendant Nicolais knew that Wesley Robbins was the true author rather than himself. In addition, the earlier Historic Structure Report reported that Wesley Robbins was the true author (EXHIBIT D-2).

47. In addition, Defendant Nicolais fraudently claimed that he "assisted" the Plaintiff in preparing the National Historic Landmark nomination. The word "assisted" in this National Historic Landmark nomination was officially designated for  Michael Tomlan, Director of Preservation Education at Cornell University (EXHBIT C-1 to C-2). Tomlan provided the critical direction and support for the completion of the Village Green Landmark nomination (1996 to 2000).  For during this period, the Department of Interior did not have a specialist in the area of town planning.  Michael Tomlan (with a PhD in urban planning) assumed that critical role in order to facilitate the National Historic Landmark nomination for the Village Green or it would not have been done. In addition, Michael Tomlan had almost three decades in preparing and teaching others to prepare National Register and National Landmark nominations

13

48. A more accurate assessment of Defendant Nicolais' role is provided in the National Historic Landmark nomination (EXHIBIT C-1 to C-2). It states that Defendant Nicolais wrote the description. He wrote this based on the literature that the Plaintiff gave him. These sources are listed on page 13 of the National Historic Landmark . Defendant Nicolais completed the description during a four-month period in early 2000 (January to April) after the Plaintiff's section on national significance was approved in early January 2000. In contrast, the Plaintiff's work took her over five years to prepare.

49. Defendant Nicolais' "research" contributions to the National Historic Landmark nomination were exaggerated in the Cultural Landscape Report (2013) and the Historic Structures Report (2010). In contrast to Michael Tomlan (who has been listed secondary in these documents), Defendant Nicolais did not have the professional background to make any substantial contribution to the national significance of Baldwin Hills Village.

50. First, Defendant Nicolais did not have any prior experiences in preparing historic certifications. Second, Defendant Nicolais lacked the knowledge that was essential to the success of this nomination---the history of town planning, the international Garden city movement, and the in-depth understanding of the Village Green consulting architect Clarence Stein. Third, he never traveled to any of the five east coast Garden cities designed by Clarence Stein and performed the site analyses in architecture, landscape architecture, and town planning. The federal government required this survey in order for the Baldwin Hills Village National Historic Landmark nomination to be completed.

51. Defendant Robert Nicolais' other involvement with the National Historic Landmark included attendance at an inspection with a federal official (1996); the contribution of consulting architect Clarence Stein's contract with the founding

14

architects that he found at Cornell University (1999); and the editing of the National Landmark nomination for accurate architectural terms (1999).

52. Defendant Robert had full knowledge of the many individuals who contributed generously to the preparation of the Baldwin Hills Village National Historic Landmark nomination. These individuals are listed on LandmarkWatch.org under "acknowledgments" in the history section. However, he did not contribute this information to the Cultural Landscape Report (2013) and the Historic Structure Report (2010). These omissions helped to further his prominence.

53. For over a decade, Defendant Nicolais has demonstrated that the intent of his fraudulent misrepresentation was promotion in preserving the LeBrun mural. He not only used his fraudulent claim relating to the Village Green's historic certification, but also his fiduciary position to the homeowners and his profession as an architect. At present, Defendant Nicolais does not meet the Secretary of Interior Standards for preservation architect (EXHIBIT M-3).

54. With these advantages, Defendant Nicolais during a decade was able to divert outside funding efforts toward this one project. Consequently, he was not receptive to the involvement of leading preservation professionals who would insure a system of checks and balances (which is common practice for other National Historic Landmarks).

55. The mural is not in the listing of nationally significant elements in the National Historic Landmark nomination survey for the federal government (EXHIBIT C-1). First, its historic integrity was compromised because it was covered over with plaster and paint. Second the artist (evaluated as long forgotten by Los Angeles Times critic Christopher Knight) did not make a contribution to the national significance of the total site.

15

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**19**

56. Consequently, the long-range preservation plans for the nationally significant landscapes and buildings did not begin until a decade later. As a result of funds being diverted to the mural project, the Village Green Homeowners Association lost substantial preservation funding opportunities for the nationally significant landscapes and buildings.  At the end of the decade, the homeowners therefore were left with a large assessment of 5 million dollars for deferred maintenance that could have been avoided.

57. Defendant Robert Nicolais was finally able to obtain the funding that he needed for the restoration of the LeBrun Mural during 2010 after several years of unsuccessful funding efforts.  During 2009 to 2010, he personally was involved as a Board member and joint leadership of the Mills Act (state and City's property tax reduction program for homeowners of historic properties), which would raise 6 million dollars within a decade for preservation projects. In this fiduciary position, Defendant Nicolais was able to include this project in the Mills Act contract, which was finalized on December 23, 2010 by the City of Los Angeles.

58. The Plaintiff discovered this fact about the LeBrun Mural on March 29, 2011 when the City's Mills Act coordinator e-mailed the contract to her (EXHIBIT O-1).  The Board of Directors did not present the Mills Act contract to the homeowners before it was adopted in December 23, 2010. Archive.org indicated that the Mills Act contract was made public to the homeowners over two years later on May 12, 2013. This is constructive fraud as the Board of Directors (and Defendant Nicolais as the Mills Act's joint leadership) has the fiduciary and legal duty to present this contract to the homeowners before its adoption. The above action is within the statute of limitation as the Plaintiff filed the original complaint on December 23, 2013.

16

**EXHIBIT B**
**20**

59. The statute of limitation for the Cultural Landscape Report and the Historic Structures Report is within the three-year period for fraud. The Cultural Landscape Report was completed in 2013. The Historic Structures Report was completed in May 2010. However, the Plaintiff discovered its existence a year later on May 2012. Archive.org indicated that it appeared on the homeowners association's website on December 19, 2011 (EXHIBIT P). However, the homeowners did not participate in the review of this document as dictated by common practice nor did they nor did the Defendants inform the homeowners that it was completed until much later. Based on the Plaintiff's discovery on May 2012, the Historic Structure Report is within the three-year statute of limitation for fraud in this Cause of Action.

60. The Plaintiff requests the following restitutions. First, Defendant Robert Nicolais is to pay damages for fraudulently misrepresenting his contributions to the National Historic Landmark and in the process continues to diminish the Plaintiff's involvement. The most recent of his fraudulent misrepresentations appear in the Historic Structure Report and the Cultural Landscape Report. The amount is to be determined by the courts.

61. Second, Defendant Robert Nicolais is to be removed from his position as the official representative to the National Historic Landmark program and adviser on preservation activities because of his prolonged damages to the community due to his fraudulent misrepresentation. Instead for the sake of the community, the Board of Directors is to follow the common practice of other National Historic Landmarks in the nation. This is to select a highly qualified preservation architect who meets the Secretary of Interior Standards for Qualified Preservation Professionals (EXHIBIT M-3). The Los Angeles Conservancy and the National Park Service are to offer recommendations.

17

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**21**

62. Third, the Board of Directors is to correct the information in the Historic Structure Report and the Cultural Landscape Report (official documents) to give more accurate information about the Plaintiff and those individuals who contributed to the lengthy historic certifications of the Village Green.

## THIRD CAUSE OF ACTION

### (Appropriation and Nonpayment of Landmark Nomination—Tort)

63. The rights of an individual to his private property against the arbitrary dictates of government were a central concern to the founders of the U.S. Constitution in 1787. For they understood that all rights of an individual are non-existent when a governing entity can take the rights to his property.

64. This Cause of Action discusses the Defendants' arbitrary appropriation of the Plaintiff's intellectual property (the National Historic Landmark nomination) without the due process that is protected by the U.S. Constitution. At the same time, the Defendants violated their fiduciary duties as stipulated by the Business Judgment Rule (Corp. Code 7231.5) and public policies concerning National Historic Landmarks.

65. After the Village Green became a National Historic Landmark in 2001, the Defendants refused to pay the Plaintiff for the nomination. However, they immediately appropriate the certification (Village Green National Landmark) that was produced by the Plaintiff's intellectual property. They placed "Village Green National Landmark" on all written communication and signs in front of the community to enhance the community's prestige. In 2005, they used this certification to establish a nonprofit in order to solicit outside funding. The most successful project so far is the 6 million dollar funding to be received within a

18

decade from the Mills Act (property tax reductions for owners of historic properties).

66.    Several years later, the Defendants appropriated the results of the Plaintiff's research from this intellectual property. They used it in developing the foundation for their two major preservation documents---the Historic Structure Report (2010) and the Cultural Landscape Report (2013). In addition, Defendant Steven Keylon, the self-appointed official historian of the Village Green, used the Plaintiff's research to build his credentials (EXHIBIT M-1). In 2013, the Defendants completely appropriated the Plaintiff's intellectual property by placing it on their website and committed copyright infringement (see First Cause of Action).

67. During this prolonged period of appropriation, the Defendants inflicted a continual series of injuries or torts against the Plaintiff. These were related to her attempts in recovering her life savings and loans that she invested in the preparation of her intellectual property.  These torts also included the Plaintiff's preservation efforts in protecting the National Historic Landmark certification (produced by he intellectual property) for the Village Green community.

68. Finally in 2011, the Plaintiff's efforts were unsuccessful in recovering her costs and establishing proper preservation standards.  For the Defendants (Board of Directors) occupied a position of a fiduciary with full power over the Plaintiff, a beneficiary.  As indicated in the Introduction of this complaint, the Plaintiff lost her Village Green home of thirty years through foreclosure (April 6, 2011) and then later declared bankruptcy (August 15, 2011). The Internal Revenue Service evaluated the Plaintiff as a "hardship case" in October 29, 2012 and January 2014 because of her inability to pay her taxes. The Introduction also indicates that the Plaintiff has no assets and her only income is her very limited teachers retirement.

19

*COMPLAINT FOR DAMAGES*

**EXHIBIT B**
**23**

69. A chronology (1997 to 2013) of these continual torts that the Defendants inflicted against the Plaintiff concerning nonpayment for her intellectual property has been enclosed in this complaint (EXHIBITS L-1 to L3). The primary documents are located on the password protected LandmarkWatch.org (archives).

70. From the beginning, the Defendants knew from federal documentation (1992 and 1996) that this National Historic Landmark was of such complexity that the federal government could not afford to undertake it (EXHIBITS G-1to G-2). The Defendants also knew by January 2001 that it was common practice for National Historic Landmarks to be prepared by paid professionals. For the Plaintiff wrote about her experiences at the federal government's National Landmark hearing in Washington D.C. that involved the review of 27 nominations from across the nation (EXHIBITS G-3 to G-4)

71. Prior to the Village Green's certification as a National Historic Landmark, the Defendants gave consent to the federal government for this listing (EXHIBIT F-4), along with petitions signed by 70% of the homeowners (which are still available). In October 2000, the homeowners voted 100% for this certification in an election conducted by the federal government. At that same time, the Defendants fully understood the benefits that came from being a National Historic Landmark (EXHIBIT F-1 to F-3).

72. The chronology indicates that the Defendants consistently fought against payment to the Plaintiff from 2001 to 2011. There is no evidence that the Defendants followed their fiduciary responsibilities to conduct reasonable inquiry as required by the Business Judgment Rule (Corp, Code § 7231.5). They did not consult with any expert who prepared National Historic Landmarks, and these professionals were readily available to them (EXHBITS H-2 to H-4). At the same

time, the Defendants continued to appropriate the Plaintiff's intellectual property (with its certification) to gain prestige and economic benefits.

73. During this decade, the Plaintiff conducted research on recent National Historic Landmarks in Los Angeles City (Aline Barnsdall Complex and Eames House) and thirteen National Historic Landmarks certified in the state of California. She made this information available to the Defendants, but they continued to deny her payment.

74. Instead, the Defendants relied on Defendant Robert Nicolais who was their official representative for the National Historic Landmark program. He supported nonpayment and stated that the Plaintiff is a "volunteer" (EXHIBIT H-1). However, Defendant Nicolais had access to information that professionals and not volunteers prepare National Historic Landmark nominations.   For during a decade, he attended annual meetings (sponsored by the federal government) for owners of National Historic Landmark properties. He was aware of the Plaintiff's extensive research on recent National Historic Landmarks.

75. After the Plaintiff lost her home and left the Village Green permanently, she continued to receive information that paid professionals and not volunteers prepare National Historic Landmark nominations. Preservation professionals continue to support this common practice (EXHIBIT J-1 to J-2).

76. Finally in the year 2013 and January 2014, the federal government conclusively demonstrated that paid professionals perform these technical nominations through its series of webinars (EXHBITS K-1 to K-4). In fact, these presentations indicated that very few professionals are actually able to successfully undertake this type of work because of its high requirements.

77. The Defendants, in their decision as described above, are legally mandated to not only follow the Business Judgment  Rule (Civil Code §7231.5) but also the

21

U.S. Constitution and public policy (Lamden v. La Jolla Shores and Nahrstedt v. Lakeside).

78. The injuries or torts that the Defendants inflicted on the Plaintiff were not just confined to the appropriation of her intellectual property. As the founders of the U.S. Constitution well know, an individual loses all his rights when a governmental entity can take away his property.  For the Defendants, in a fiduciary position of power, also violated the Plaintiff's First Amendment Rights to freedom of expression, assembly, and association.

79. The Defendants excluded the Plaintiff from speaking and writing about her situation in their official forums. During a decade, her name was excluded from all the homeowners' written communications, except when it related to denial of payment to her for the National Historic Landmark nomination.

80. In addition, Defendants Nicolais and Keylon provided the leadership in excluding the Plaintiff from community activities relating to the National Historic Landmark and the history of the Village Green. This included membership in the National Landmark committee, the nonprofit organization, and the Mills Act Committee even though she was eminently qualified. The Plaintiff also was excluded from giving outside tours of the Village Green.

81. According to documentation, Defendants Robert Nicolais and Steve Haggerty were the most active for the longest period in participating in these torts against the Plaintiff as they were involved beginning in 2001.  Defendant Haggerty has been active on the Board of Directors since 2001with some interruptions of service. His 2009 letter to the Plaintiff indicates that no due process was followed in denying the Plaintiff's payment for the National Historic Landmark nomination (EXHIBIT H-4).  Later, Defendant Steve Keylon joined them in their torts against the Plaintiff after moving to the Village Green in 2006.

22

82. Documentation also indicate former Board member Tom Brown played a major role against the Plaintiff in both the Village Green's National Historic Landmark certification and preservation activities (1994 to 2008). However, he moved from the community in 2009, and his location is unknown.

83. During this decade, the Defendants as the fiduciary were fully aware that they harmed the Plaintiff (a senior citizen) permanently and that she would continue to suffer financially through her life while they profited from her efforts. In 2010 and 2011, the Defendants (particularly Nicolais, Keylon, and Haggerty as Board members) even maintained this decision of nonpayment when they witnessed the Plaintiff going through foreclosure and bankruptcy because of their actions. The year 2011 was the first year the homeowners association was to receive $600,000 from the Mills Act.

84. Given the above information, this Cause of Action is within the statute of limitation for continuing tort doctrine. "Under the continuing tort doctrine, where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortuous acts cease" (West's Key Number Digest, Limitation of Actions 55(6). See also Davies v. Krasna (1975) 14 C3d502.513.121 CR 705, 712 .

85. The last tortuous act were the Defendants' copyright infringement of the Plaintiff's intellectual property---the Baldwin Hills Village National Historic Landmark (First Cause of Action) and the misrepresentations in the homeowners association basic preservation documents (Second Cause of Action).

86. In addition to the above completion of actions, the Plaintiff suffered her final injury when she was evaluated economically by the Internal Revenue Service as "a hardship case" on October 29, 2012 and then later in January 2014. At 75 years old, she has no assets with her income being only her limited teachers retirement.

23

**EXHIBIT B**
**27**

86. The Plaintiff requests the following restitutions. First, the Defendants pay the Plaintiff for preparing the Baldwin Hills Village National Historic Landmark nomination. At least, two experts who have prepared National Historic Landmark nominations are to be consulted on the final amount.

87. Second, the Defendants pay damages to her for over a decade of violation of her constitutional rights in the certification and preservation of the Village Green. In addition, the Plaintiff requests damages for emotional stress, related medical problems, and loss of earnings from a career she was not able to pursue. The amount of restitution is to be determined by the courts.

FOURTH CAUSE OF ACTION

(Fraud Relating to Mills Act and Other Preservation Activities)

88. The Second Cause of Act defines fraud according to Civil Code §3294, subd. (e)(3): "…. an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

89. In this section, the concept of fraud is further examined to include constructive fraud (breach of fiduciary duties) and fraud in professional misrepresentations. This involves the formation of the Village Green's Mills Act contract, the Historic Structures Report, and the Cultural Landscape Report. It also examines Defendants Steve Keylon and Robert Nicolais' leadership involvement with these documents, along with the Board of Directors who gave final approvals.

90. California Civil Code Section 1573 defines constructive fraud as "1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, 2. In any such act

24

**EXHIBIT B**
**28**

or omission as the law specially declares to be fraudulent, without respect to actual fraud."

91. As indicated in the Second Cause of Action, the named defendants (who provided the leadership) and the Board of Directors excluded the homeowners and other stakeholders from reviewing and participating in the formation of the Mills Act contract. In fact, the Defendants intentionally excluded the Plaintiff even though the City of Los Angeles recommended to Cornell University that she would be fully qualified to help with the Mills Act (EXHIBIT O-2).

92. The contents of the Mills Act contract were known only after it was finalized in December 23, 2010. The Plaintiff (who was then still a homeowner) discovered it on March 29, 2011. This contract was uploaded on the homeowners association's website by May 12, 2013 (according to Archive.org).

93. This protracted delay is a violation of the Department of Interior Standards for Preservation Planning, which advocates a transparent and collaborative approach in preserving the nation's irreplaceable cultural assets.  These Standards serve as the foundation for other National Historic Landmarks in both their preservation and funding efforts. In addition, California condominium law mandates that the Board of Directors is to follow public policy, such as the Department of Interior Standards for Preservation Planning (based on Lamden v. LaJolla Shores and Nahrstedt v. Lakeside). This is particularly appropriate as the proper preservation of the Village Green's historic fabric is an economic advantage for the homeowners.

94. The Defendants' violation of the Secretary of Interior Standards for Preservation Planning is also a violation of the Plaintiff and homeowners' First Amendment rights to assembly, association, and free speech to affairs that are

25

**EXHIBIT B**
**29**

essential to their well-being and economic interest. Again, the above cases mandate that the Board of Directors is to follow the U.S. Constitution in their decisions.

95. Defendants Keylon and Nicolais were fully aware that it is common practice for National Historic Landmarks to include the homeowners and stakeholders in forming the Mills Act contract. They had access to this information from interviews that the Plaintiff conducted with administrators of five leading National Historic Landmarks for her Cornell University's fellowship (2008 to 2010). The transcripts are on LandmarkWatch.org for them to review.

96. In the examination of the Mills Act contract, the Plaintiff is concerned with three items that could compromise the Village Green's National Historic Landmark. The first is the lack of funds for the development of comprehensive maintenance plans for the nationally significant buildings and landscape. The landscape is considered to be the nation's most important cultural landscape west of the Mississippi. These maintenance plans will insure that the 6 million dollar funding from the Mills Act will be spent wisely.

97. Architectural Resource Group in its Historic Structure Report (2010) made the following recommendation for the buildings: *"Develop a Maintenance Plan for the Village Green, which will outline a plan for implementation of treatment proposed in this report. A Maintenance Plan should provide scope and conceptual costs for repair projects, identify appropriate materials and methods for treating historic fabric, identify possible sources of replacement materials, and establish inspection schedules for continued upkeep of building materials and systems".* Architectural Resource Group also recommended a Landscape Maintenance Plan.

98. The second area of concern in the Mills Act contract is the unrestricted authority of the Board of Directors in the preservation of the Village Green's nationally significant and irreplaceable cultural assets. The only direction

26

**EXHIBIT B**
**30**

presented is the Secretary of Interior's for the Treatment of Historic Properties. Two other public policies needed to be included for future preservation and funding opportunities---Secretary of Interior's Preservation Planning and Secretary of Interior's Qualified Preservation Professionals. Associated with this area of concern is the lack of budgeting for preservation professionals who are to monitor and guide the preservation activities of the community This is common practice for other National Historic Landmarks.

99. The third area of concern is the inclusion of the personal preservation projects of Defendant Nicolais (the LeBrun Mural) and Keylon (the painting program) in the Mills Act contract over the above items mentioned. This is a breach of their fiduciary duties and is fraudulent.

100. This Cause of Action is also concerned with Defendants' fraudulent representation as preservation professionals in the Historic Structure Report and the Cultural Landscape Report. As mentioned in the Second Cause of Action, fraudulent representation as a preservation professional can lead to a loss of millions of dollars to the community and a steady deterioration of the nationally significant buildings and landscape.  The federal government has developed the Secretary of Interior Standards for Qualified Preservation Professionals to protect the public from unqualified individuals who can compromise or destroy the nation's irreplaceable cultural assets.

101. Documentation indicates that Defendant Keylon has been actively involved as a historian in connection to the Village Green's Historic Structure Report and the Cultural Landscape Report (M-1). He served on the Board of Directors for six years (beginning in 2006). In this fiduciary position, he appointed himself as the official historian and had his own blog on the homeowners association. As mentioned in the Third Cause of Action, he excluded the Plaintiff from being

27

involved in any activities associated with the National Historic Landmark program and the Village Green history.

102, Defendant Keylon, serving as a fiduciary, also excluded the Plaintiff from being involved in the preparation of the Historic Structure Report even though she was eminently qualified because of her Cornell University's fellowship on the preservation of Stein communities. He also excluded Kathryn Smith, noted historian and the preparer of the Village Green's Los Angeles City Landmark nomination, who had extensive experience with Historic Structures Reports. Defendant Keylon's actions are against the collaborative efforts recommended in the Secretary of Interior Standards for Preservation Planning.

103. Thus, Defendant Keylon was the initial contact from the Village Green to meet with professionals from the Architectural Resources Group in order to begin the preparation of the Historic Structures Report. He was able to insert his historic contributions in this document's acknowledgement even though he did not met the Secretary of Interior Standards for architectural historian. It included the 2007 "The Use of Color at Baldwin Hills Village from 1941 to the Present Day (EXHIBIT D-2).

104. Defendant Keylon, who writes history, is not qualified to write about the preservation history of buildings (which includes colors), especially when the Village Green's painting program costs over a million dollars in a decade. However, Defendant Keylon (acting as a fiduciary) for several years has used his color research to change dramatically the colors of the 96 buildings without professional oversight or consideration of the residents' safety. Federal site inspections for the National Historic Landmark in 1996 and 2000 have indicated that the previous light and neutral colors were correct in the historic evolution of the Village Green.

28

105. The Secretary of Interior Standards states this qualification for architectural historian (or historian who writes about architecture): "The minimum professional qualifications in architectural history are a graduate degree in architectural history, art history, historic preservation, or closely related field, with coursework in American architectural history , art history, historic preservation or closely related field plus one of he following: 1. At least two years of full-time experience in research, writing, or teaching in American architectural history or restoration architecture with an academic institution or restoration architecture with an academic institution, historic organization or agency, museum, or other professional institution; or 2. Substantial contribution through research and publication to the body of scholarly knowledge in the field of American architectural history" (EXHIBIT M-3).

106. Defendant Steven Keylon also states in his resume that he "co-authored the Cultural Landscape Report" for the Village Green. Again, he violated the preservation standards that the federal government has for a cultural landscape historian. His efforts and those of his two colleagues give an inadequate history of this community's historic landscape in the Cultural Landscape Report. For these volunteers do not have the professional background to undertake this technical work.  Thus, the historic landscape will not be properly preserved and outside funding (if any) will be limited. This funding includes disaster recovery. In addition, this will create a financial burden for the homeowners.

107.  The National Park Service describes the following qualification for landscape historian: "a graduate degree in American studies, art history, architectural history, or historic preservation with course work in American landscape history and a knowledge of field techniques associated with the examination and evaluation of cultural landscapes; or a bachelor's degree in

COMPLAINT FOR DAMAGES

EXHIBIT B
33

American studies art history, or historic preservation with course work in American landscape history, and at least two years of full-time experience in research, writing, or teaching American landscape history with an academic institution, and knowledge of field techniques associated with the examination and evaluation of cultural landscape." This information can be found on the website www.nps.gov/history/history/online_books/nps28/28appene.htm.

108. The Village Green's Cultural Landscape Report describes the leadership involvement of Defendants Keylon and Nicolais with other volunteers. However, prominent professionals have been excluded or placed in a minor role, including one of the nation's most outstanding historic landscape architect from a leading university. These actions are definitely against the Secretary of Interior's Standards for Preservation Planning and also the state of California's Business Judgment Rule for condominiums. Also, these actions may place further financial burdens on the homeowners as resources will not be well used, and can lead to eventual loss of the Village Green's National Historic Landmark certification.

109. The Plaintiff requests the following in the protection of the Village Green as a National Historic Landmark from the results of the Defendants' lack of professional knowledge and experience. First, It is requested that Defendants Steve Keylon and Robert Nicolais, with the Board of Directors, be held fully accountable for constructive fraud in regards to the Mills Act.

110. They violated public policy and common practice for National Historic Landmarks as they did not consult with the homeowners and other stakeholders before the ten-year Mills Act contract was finalized with the City of Los Angeles in December 23, 2010. Of particular concern is that these Defendants have inserted their personal projects in this contract while other items that are more vital (such as the maintenance plans for  buildings and landscape) were neglected.

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**34**

111. In addition, Defendants Steve Keylon and Robert Nicolais should be held fully accountable for fraudulently representing themselves as preservation professionals. They do not meet the Department of Interior's Standards for Preservation Professionals, either as historians or architects.

112. The Village Green Board of Directors needs to hire preservation professionals with extensive background in preservation with recommendations from the Los Angeles Conservancy and the National Park Service rather than delegating these responsibilities to volunteers. These preservation professionals need to provide quarterly consultations with the Board of Directors, various committees, and the manager in monitoring and improving the various preservation documents. These professionals are: preservation architect, preservation landscape architect, horticulturist and arborist. Priority should be given to those associated with a university.

113. It is hereby requested that these preservation professionals work with the leadership and community in amending the Mills Act; improving the Historic Structures Report and the Cultural Landscape Report; and developing proper maintenance plans. These are to follow public policies and common practices of other National Historic Landmarks.

114. It is hereby requested that the Village Green Board be required to revise the 1972 governing documents to reflect the following: current condominium laws; protection of the National Historic Landmark certification; the federal preservation policies that include The Secretary of Interior Standards for Rehabilitation, The Secretary of Interior Standards for Preservation Planning, and The Secretary of Interior Standards for Preservation Professionals; and the U.S. Constitution. Term limits for Board Directors and chairmen of various committees need to be included in the governing documents.

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**35**

115. It is hereby requested that The Board of Directors be required to develop two types of educational plans. First, Directors need to take periodic courses in condominium law and management. Second, the community needs to be educated on its history and the National Historic Landmark program. Reports are to be given to the community on the annual National Park Service meetings for owners of National Historic Landmarks.

116. Finally, The Board of Directors should be required to work with Cornell University and the federal government in disaster planning and recovery. This includes the creation of digital information for the nationally significant buildings and its transfer to the National Archives. This site is located on a major earthquake fault (EXHIBIT Q-1 to Q-2).

32

COMPLAINT FOR DAMAGES

**EXHIBIT B**
**36**

Wherefore, Plaintiff prays as follows:

A. For damages, penalties, attorney fees and costs under the first cause of action (copyright infringement), according to proof at trial;

B. For restitution under the second cause of action (Fraudulent Claim to National Register and National Historic Landmark certification, according to proof at trial;

C. For restitution under the third cause of action (Appropriation and Nonpayment of the National Historic Landmark Nomination-tort) according to proof at trial in an amount to compensate Plaintiff for the labor which generated the benefits enjoyed by Defendants and all the members of Defendant Association

D. For declaratory relief under the fourth cause of action which declares the scope and extent of the duties of Defendant with respect to the maintenance of the historic Landmark designation with its attendant economic and aesthetic value to all homeowners in the Association;

E. For reimbursement and restitution according to proof in the amount of any and all unreimbursed expenditures made on behalf of Defendants;

F. For general damages for emotional distress according to proof at trial;

G. For Punitive damages against all Defendants guilty of oppressive and malicious conduct according to proof at trial;

H. For costs and fees incurred in this action.

Dated: April 29, 2014

_Dorthy Fue Wong_
----------------------------------------
Plaintiff, Dorothy Fue Wong, in pro per

33

*COMPLAINT FOR DAMAGES*

**EXHIBIT B**
**37**

# INDEX TO EXHIBITS

| | |
|---|---|
| **A-1 to A-2**<br>*page 36-37* | Copyright to Baldwin Hills Village National Landmark Nomination<br>         (April 25, 2011) |
| **B-1**<br>**B-2 to B-3**<br>*pages 38-40* | 1. Copyright Infringement on Defendants' Website<br>2. Columbia University Checklist for Fair Use |
| **C-1 to C-3**<br>*pages 41-43* | Baldwin Hills Village National Historic Landmark Nomination<br>(first page---complete document on LandmarkWatch.org |
| **D-1 to D-2**<br>*pages 44-45* | 1. Cultural Landscape Report (contributors)<br>2. Historic Structures Report (contributors) |
| **E-1 to E-3**<br>*pages 46-48* | Summary of Activities, Hours and Costs in Preparing<br>     Baldwin Hills Village National Landmark Nomination<br>          from 1994 to 2000 |
| **F-1 to F-3**<br>**F-4**<br>*pages 49-51* | 1. National Landmark Benefits (sent to homeowners---Fall 2000)<br>         *revised 2010 on LandmarkWatch.org*<br>2. Board of Directors' consent to federal government for<br>     National Historic Landmark designation (2000)<br>     *Also available are petitions signed by 70% of the homeowners*<br>*to the federal government for National Historic Landmark.* |
| **G-1 to G-4**<br>*pages 52-56* | 1. Federal government's letter on difficulty---September 1993<br>2. Federal government's letter on difficulty—March 1996<br>3. Dorothy Fue Wong's letter to homeowners on National<br>Landmark Hearing on November 9, 2000<br>         (written on January 5, 2001) |
| **H-1 to H-4**<br>*pages 57-60* | 1. Robert Nicolais' letter (November 28, 2001)<br>2. Board Attorney Kelly Allegraweil's letter ((January 25, 2002<br>3. President Reba Glover's letter (September 12, 2008)<br>4. President Steve Haggety's letter (March 25, 2009) |

*COMPLAINT FOR DAMAGES*

**EXHIBIT B**
**38**

| | |
|---|---|
| **I-1**<br>**I-2 to I-3**<br>*pages 61-63* | 1. Chart on Los Angeles City's National Landmarks<br>(1997 to 2007)<br>2. Chart on California's National Landmarks (1999 to 2010) |
| **J-1 to J-2**<br>*pages 64-65* | Professional evaluations of Costs in Preparing National<br>Landmark Nominations   (2013) |
| **K-1 to K-2**<br>**K-3 to K-4**<br>*pages 66-69* | 1. Federal government's Webinars for Preparing National<br>Landmark Nominations (2013)<br>2. Webinar---Hiring a Consultant to prepare a NHL nomination<br>(January 2014) |
| **L-1 to L-3**<br>*pages 70-72* | Chronology of Defendants' Appropriation and Non-Payment of<br>Plaintiff's National Historic Landmark nomination.<br>Included  are Defendants' gains in bold-faced  (1997 to 2013) |
| **M-1**<br>**M-2 to M-3**<br>*page 73-75* | 1. Steven Keylon's resume<br>2. Secretary of Interior's Professional Qualifications<br>Standards |
| **N-1 to N-2**<br>**N-3 to N-4**<br>*pages 76-79* | 1.National Landmark Preservation Checklist for Stein<br>Communities.  From  2010  Cornell  University's  Stein<br>Fellowship on common practices of five leading National<br>Landmarks in Los Angeles County.<br><br>2.Preservation Sources from LandmarkWatch.org (2013) |
| **O-1**<br>**O-2**<br>*pages 80-81* | 1. E-mail copy of Mills Act contract to Plaintiff from Los<br>Angeles City's Mills Act coordinator (March 30, 2011)<br>2. Los Angeles City's Letter of Recommendation for Plaintiff<br>to work on Mills Act (May 20, 2008)<br>*Mills Act Contract (final on December 23, 2010)*<br>*See 22 page contract on website VillageGreenLA.net* |
| **P-1**<br>*pages 82* | Douglas Clark's Web Analysis of Defendants' Website<br>(Village GreenLA.net) |
| **Q-1 to Q-2**<br>*pages 83-84* | The federal government's recommendation for the Plaintiff's<br>Cornell University Fellowship ( Disaster Planning of Stein<br>Landmark communities)  (March 25, 2014) |

35

**EXHIBIT B**
**39**